David H. Stern and Serene Stern v. Commissioner.
Stern v. Commissioner
Docket Nos. 388-62, 1724-62.
United States Tax Court
T.C. Memo 1965-242; 1965 Tax Ct. Memo LEXIS 88; 24 T.C.M. (CCH) 1239; T.C.M. (RIA) 65242; September 3, 1965
*88 Sidney B. Gambill, for the petitioners. Hobart Richey, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: In these consolidated proceedings the respondent determined deficiencies in the income taxes of petitioners for the years 1959 and 1960 in the amounts of $7,749.63 and $15,773.90, respectively. These deficiencies arise mainly from respondent's determination that petitioners were not entitled to treat certain amounts received in 1959 and 1960 as proceeds from the sale of capital assets taxable as long-term capital gains. Respondent also disallowed a capital loss carry-over deduction for 1959 and a capital loss deduction for 1960, except to the extent of $1,000 for each year. The parties have stipulated that, if the amounts received in 1959 and 1960 are taxable as capital gain, the deductions will be allowed to the extent claimed, and that, if the amounts in contention are not taxable as capital gain, respondent's determinations are correct. By a second amended answer filed subsequent to trial, in docket No. 1724-62, respondent alleged that petitioners had not reported as taxable income for 1960 all of the amounts received in *89 that year with respect to the transaction in question. By this second amended answer respondent claimed a further deficiency for 1960 of $1,686.13 or, in the event we decide that the sums received were capital gains, of $648.51. The issues for our decision are: 1. Whether an assignment of certain leases by petitioner David H. Stern and Bernard Goodman to Sinter Fuel Corporation, dated June 17, 1958, constituted a sale of capital assets held for more than six months; and 2. Whether the sum of $2,594.05 received by petitioners in 1960 from the Sinter Fuel Corporation represented taxable income or the repayment of a loan. Findings of Fact Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. During the calendar years 1959 and 1960 David H. Stern (hereinafter sometimes referred to as petitioner) and Serene Stern were husband and wife and filed their joint Federal income tax returns with the district director of internal revenue at Pittsburgh, Pennsylvania. They kept their books and filed their tax returns on a calendar year basis and on the cash receipts and disbursements *90 method. Serene Stern is a petitioner herein only by virtue of having filed joint returns with petitioner for the years in issue. During the late 1940s petitioner met Marshall J. H. Jones (hereinafter referred to as Jones) and they agreed to enter the coal business in Pittsburgh as partners. Shortly after they entered the business the price of coal dropped and the business arrangement was discontinued. Jones then convinced petitioner that a lot of carbon was in ash piles in the Pittsburgh area which had accumulated for many years from the old type of beehive oven coking operations. The original method of manufacturing steel required carbon in its purest form. This gave rise to the use of coke which was produced by burning coal for approximately 72 hours in beehive ovens. After it had been burned, the coke was pulled out and the smaller particles were screened out. Any particles that fell through the screens went on an ash pile. The size of the screens used varied over the years from an inch and a quarter down to three quarters of an inch. The coke that went into the ash piles accumulated into large heaps which have been accumulating from at least 1890 on. Petitioner and Jones organized *91 Jones Coal & Briquet Company, a corporation, for the purpose of reclaiming material from these ash piles. This corporation lost a considerable amount of money and went bankrupt. The Jones Coal & Coke Company was incorporated as a Pennsylvania corporation in June 1950 and its name was changed to Sinter Fuel Corporation (hereinafter sometimes referred to as Sinter Fuel) in February 1956. (The name Sinter Fuel Corporation will hereinafter also refer to Jones Coal & Coke Company.) From July 28, 1950, through the year 1960, Bernard Goodman (hereinafter sometimes referred to as Goodman), an attorney practicing in Pittsburgh, and petitioner each held 50 percent of the stock in Sinter Fuel. The capital account of the corporation indicated stock issued on June 3, 1951, in the amount of $1,500. On July 9, 1951, petitioner, Goodman and Virginia Hack were elected directors of Sinter Fuel and continued in such capacity through the year 1960. From July 11, 1955, through 1960, the following were officers of Sinter Fuel: President
David H. Stern
Vice President
Serene Stern
Vice President in charge
of sales
William Stratton
Secretary
Virginia Hack
Treasurer
Bernard Goodman
*92 Petitioner was a pioneer in developing the process for recovery of a marketable product from coke ash waste material. He developed and patented a process for using the recovered coke ash material together with iron ore to make the final product used by the steel companies in their blast furnaces. Sinter Fuel had no employees who operated the various properties. All operations were carried on through independent contractors. Placido Manoli (hereinafter sometimes referred to as Manoli) was an independent contractor, doing business as Manoli Coke Company (hereinafter sometimes referred to as Manoli Coke), employed by Sinter Fuel. He hired all of the men who worked on Sinter Fuel's ash piles and processed the material for a fixed amount per ton. After Manoli's death his son continued doing business with Sinter Fuel on the same basis. Petitioner frequently advanced moneys, by personal check, to Manoliand others. From time to time Sinter Fuel paid moneys to petitioner which were recorded as "reimbursement" for the amounts advanced to Manoli or others. Sinter Fuel owned the plants and some of the ash piles and was also the lessee of some properties on which ash piles were located. *93 Petitioner suffered a coronary heart attack in 1955 and was in the hospital for six weeks. He was hospitalized with recurring heart attacks in 1959 and 1964. Goodman had a tubercular kidney removed in 1955 and his other kidney was affected. On June 17, 1958, petitioner and Goodman entered into the following agreement, prepared by Goodman, with Sinter Fuel: Entered into this 17th day of June, 1958, between D. H. Stern and Bernard Goodman, of Pittsburgh, Pennsylvania, hereinafter designated as parties of the first part, and Sinter-Fuel Corporation, a Pennsylvania corporation, office 916 Frick Building, Pittsburgh, Pennsylvania, hereinafter designated as party of the second part. WHEREAS, the parties of the first part are the owners of the following leases: Fayette County, Pennsylvania: Revere Continental #1 Lambert Orient Dearth Smock Grindstone Brier Hill Oliver 3 Thomson #3 Republic Oliver 1 Westmoreland County, Pennsylvania: United Mammoth Marguerite; and WHEREAS, said leases are needed by the party of the second part to enable it to fill customers' orders and to assure a future supply. NOW, THEREFORE, THIS AGREEMENT WITNESSETH AS FOLLOWS: *94 TO-WIT: 1. The parties of the first part agree to sell to the party of the second part, effective as of July 1, 1958, the leases above enumerated. 2. The party of the second part agrees, in consideration of the transfer to it of said leases, to pay to the parties of the first part in equal amounts the sum of fifty (50() cents per ton for each ton sold and delivered therefrom except salamander for which the sum of Two and no/100 ($2.00) Dollars per ton shall be paid. 3. The party of the second part agrees to monthly furnish to the parties of the first part a written statement showing all shipments made in the previous month and to accompany it with a check in payment of the tonnage sold and delivered. IN WITNESS WHEREOF the parties hereto have hereunto set their hands and seals. WITNESS: /s/ Virginia Hack /s/ Virginia Hack /s/ D. H. Stern (SEAL) /s/ Bernard Goodman (SEAL) ATTEST: /s/ Virginia Hack, Secretary SINTER-FUEL CORPORATION By /s/ D. H. Stern, Vice President The "leases" [1] listed above covered coke ash piles located at various properties. All of the leases, except one, show either petitioner or petitioner and Goodman as grantees or assignees. The *95 one lease that did not show petitioner or petitioner and Goodman as grantees showed Manoli and Sinter Fuel as lessees; however, this property contained no coke ash but was the site of certain machinery. Petitioner arranged for most of the leases involved and frequently paid for them by personal check. However, petitioner sent Manoli to purchase some of the leases because he was afraid that if he pulled up in his Cadillac car the sellers would want too much money. When Manoli purchased these leases he would then assign them to petitioner and Goodman. Petitioner and Goodman had an understanding that they each owned a 50 percent interest in any coke ash leases that either purchased for themselves, whether or not both were shown as grantee or lessee. From *96 time to time petitioner and Goodman would meet and even out their accounts so that their 50 percent arrangement would be maintained. Of the fourteen properties named in the assignment of June 17, 1958 (hereinafter sometimes referred to as the assignment), six were obtained in one document negotiated with Mark and Ada Sugarman in November 1955. The properties named are the coke ash piles at Grindstone, Smock, Lambert, Mammoth, Marguerite, United and Bitner (the last property is not mentioned in the assignment of June 17, 1958). The following letter was sent by Mark Sugarman to Jones Coal and Coke Company on November 22, 1955: I am returning the proposed agreement for royalty on the coke ash properties as the same do not state when you intend starting operations and the minimum set by you is based upon what you will take during the entire year and I would prefer it to be monthly, even if on the same basis. Mr. Barasch gave me to understand that you are to commence operation in the beginning of the month of December and that your operations at one or more plants shall continue at such plants as you begin at and not jump from one to the other. Please correct the agreements in accordance *97 with this understanding and I will be glad to sign them upon receipt of same. If you correct the agreements, you may sign them before sending them on to me and I can then forward you your copy duly signed and witnessed. I would appreciate your sending the agreements SPECIAL DELIVERY as I may be called out-of-town the latter part of this week. On November 25, 1955, the letter was answered as follows: Mr. Mark Sugarman, South Coatesville, Pa.
Dear Sir: Enclosed herewith is the proposed agreement in duplicate, which we trust will meet with your approval. We have not changed the yearly tonnage to a monthly basis for the reason that during the winter months the weather frequently does not permit us to screen the material. As you undoubtedly know, the cost to install a screening plant is between twenty-five and thirty-five thousand dollars, and it certainly would not be to our advantage to permit such a plant to remain idle. Also, you know it is not easy to obtain good operators if you do not give them steady work. We estimate that our annual tonnage cannot be less than one hundred thousand tons if we are to realize the cost of the installation of the plant plus operating expenses. *98 In regards to your smaller piles, we intend to use same as required to fill our orders. In other words, they will be used as reserve piles inasmuch as they are too small to justify the installation of a plant. We trust this explanation will satisfy you that we mean to operate for our mutual benefit. We will appreciate it if you and your wife will execute the agreements and return a copy for our file. Sincerely, JONES COAL & COKE CO., By… President All payments to Mark Sugarman under the November 1955 agreement were made directly by Sinter Fuel. The negotiations took place between petitioner as president of Sinter Fuel and Mark Sugarman to obtain the coke ash piles for Sinter Fuel. Oliver 1, another property listed in the assignment, was solely the location of certain equipment operated by the corporation and did not hold any coke ash. The agreement with respect to Oliver 1 was entered into on September 29, 1958, more than three months after the June 1958 assignment and was entered into by Manoli and Sinter Fuel as lessees. The property known as Dearth was acquired from Globe Dismantling Company with petitioner and Goodman as lessees. Goodman advanced the funds for *99 the Dearth property. Agreement between the parties as to the terms of the lease were reached towards the end of December 1956. The deed from Globe Dismantling Company to petitioner and Goodman was dated June 16, 1958, one day prior to the assignment of June 17, 1958. The assignment became effective as of July 1, 1958. Petitioner and Goodman both took depreciation deductions for the Dearth property for the entire year 1958 on their income tax returns for 1958. [2] This was also the first time the property appeared in either one's returns. Goodman took a depreciation deduction for the Dearth property for the entire year 1959 in his income tax return for 1959 which was repeated in an amended return for 1959 filed in August 1964. The amended return was filed to reflect the assignment of June 17, 1958, which was not reflected in Goodman's original income tax return for 1959. *100 No evidence was introduced into the record with respect to Thomson #3 Republic, one of the properties listed in the assignment. The leases here in issue were taken in the names of petitioner and Goodman because at the time of their purchase Sinter Fuel was in poor financial condition and it was felt that individuals could secure more favorable terms than a corporation. All of these leases were purchased to provide a steady supply of coke ash for the use of Sinter Fuel which was operating all but one of the properties in 1958. On February 4, 1957, petitioner filed an "Offer in Compromise" with the district director of internal revenue at Pittsburgh, Pennsylvania. He executed that document under the following statement: I declare under the penalties of perjury that this offer (including any accompanying schedules and statements) has been examined by me and to the best of my knowledge and belief is true and correct. The "Statement of Financial Condition and Other Information" signed by petitioner and attached to the offer in compromise was executed by petitioner under the following statement: I (We) declare under the penalties of perjury that the foregoing statements and information *101 are true and complete to the best of my (our) knowledge and belief and that I (we) have no assets (owned either directly or indirectly [undirectly] or any income of any nature other than as set forth herein. Petitioner did not list any of the properties set forth in the assignment of June 17, 1958, on any of the schedules attached to the offer in compromise. In the space reserved for reasons submitted by the agent for acceptance of the offer appears: *
Taxpayer is 63 years old. He has no liquid assets and no particular ability or profession. At present he is hopelessly in debt. B. D. Snodgrass (hereinafter sometimes referred to as Snodgrass) was employed by Sinter Fuel to handle its accounting affairs six to nine months prior to the end of its fiscal year ending June 30, 1958. At the time of Snodgrass' employment Sinter Fuel's books and records for the period prior to his employment did not represent a complete system. They did not contain a complete double entry system and were kept on a hybrid method *102 rather than a strict accrual or cash method of accounting. The books and records did not represent a complete picture of Sinter Fuel's corporate activities for the period prior to 1958. On June 30, 1956, there was an account on Sinter Fuel's books entitled "David H. Stern Personal Account" representing loans made by petitioner to Sinter Fuel which had a credit balance of $54,328.53. On the same date there was also an account entitled "Advances by Stern to Manoli Coke and Returned by Jones Coal & Coke Company [Sinter Fuel Corporation]" having a credit balance of $39,002.98. There was no account appearing on the books of Sinter Fuel on July 1, 1956, representing the opening balance for these accounts and the amounts due petitioner were not specifically accounted for in the books and records. There was no account on the corporate books entitled "Royalties Due" or any similar account on June 30, 1956. The various accounts on the corporate books reflecting advances made on behalf of Sinter Fuel by petitioner and withdrawals by him do not reflect coinciding advances and reimbursement. Sinter Fuel maintained records showing that petitioner made frequent advances from his own funds to *103 Manoli. These advances were recorded on the corporate books as amounts becoming due to petitioner by reason of the advances. The records also show that from time to time entries were made in this account as amounts were paid to petitioner by the corporation. For example, during the fiscal year ending June 30, 1954, he made 54 advances to Manoli or Manoli Coke on behalf of Sinter Fuel; during the same period Sinter Fuel made 42 disbursements to petitioner on account of these advances. There is no clear designation by which moneys going out and coming in may be matched or accounted for. The following chart is a partial analysis of petitioner's income for the years from 1954 through 1958: Partial Analysis of Petitioner's Income 1954-1958 [1]
Wages from
Business
Gross
Taxable
Year
Sinter Fuel
Profit [2]
Royalties
Income
Income
Tax Paid
1954
$ 5,750.00
$12,212.40
$ 17,962.40
none
none
1955
10,000.00
11,514.92
21,514.92
$11,564.19
$ 1,396.60
1956
4,500.00
5,200.00 [3]
10,454.15
8,254.15
71.68
754.15 [4]
1957
24,000.00
5,200.00
29,200.00
26,000.00
2,534.40
1958
25,000.00
5,200.00
$9,157.21
39,357.21
37,157.31
7,712.72
$69,250.00
$40,081.47
$9,157.21
$118,488.68
$82,975.65
$11,715.40
*104 The following chart is a partial analysis of wages paid and profits realized by Sinter Fuel for the fiscal years 1950 through 1962: Partial Analysis of Wages Paid and Profits Realized by Sinter Fuel 1950-1962
[1]
Fiscal
Wages Paid
Total Wages
Paid
Year [2]
to Stern
to Officers
Gross Profit
Net Income
1950
$10,750.00
$27,382.50
$ 45,004.81
$ (1,252.48)
1951
12,450.00
30,825.00
52,816.03
(6,322.97)
1952
4,500.00
10,650.00
96,087.85
(7,034.72)
1953
left blank
27,125.00
41,142.42
(12,641.96)
1954
20,000.00 [3]
42,500.00
125,432.26
(33,544.06)
1955
left blank
8,443.07 [4]
81,519.38
(24,685.10)
1956
$16,500.00
$16,500.00
$129,620.70
$ 25,431.38
1957
24,000.00
24,000.00
99,091.16
(17,038.52)
1958
25,000.00
25,000.00
136,509.19
(33.67)
1959
28,500.00
28,500.00
200,708.60
12,862.32
1960
30,000.00
30,000.00
427,948.68
115,271.56
1961
30,000.00
30,000.00
393,158.09
79,742.87
1962
30,000.00
52,000.00
178,976.91
(32,182.58)
*105 The following chart is a partial analysis of Sinter Fuel's corporate debt for the fiscal years 1950 through 1962: Partial Analysis of Sinter Fuel's Corporate Debt 1950-1962 [1]
Loans [2]
Notes
Fiscal
Year
Opening
Closing [3]
Opening
Closing
1950
$ 15,000.00
1951
$ 15,000.00
15,000.00
1952
$ 15,000.00
$ 14,500.00
1953
17,450.00
19,140.00
1954
19,140.00
39,200.00
1955
142,034.12
39,200.00
25,499.18
1956
11,000.00
25,499.18
41,121.15
1957
198,155.27
271,700.38
1958 [5]
12,657.42
149,770.70 [6]
271,700.38
159,117.84
1959
149,770.70
133,852.08 [7]
159,117.84
210,417.45
1960
210,417.45
75,732.55
1961
75,732.55
54,382.22
1962
54,382.22
67,288.50
Loans Payable Officers
Salaries Receivable Officers
1950
1951
1952
$ 1,850.00
1953
$ 1,850.00
6,013.45
$ 15,500.00
1954
6,013.45
28,208.47
$ 15,500.00
42,000.00
1955
28,208.47
42,000.00
42,000.00
1956
142,034.12
146,034.12
42,000.00
42,000.00
1957
42,000.00
12,657.42 [4]
1958 [5]
1959
1960
133,852.08
182,067.49
1961
182,067.49
164,846.22
1962
16,305.65
53,486.55
*106 On December 26, 1956, petitioner and Goodman entered into subordination agreements with the Peoples First National Bank and Trust Company (now Pittsburgh National Bank) subordinating liabilities due each of them from Sinter Fuel in the amounts of $98,896.50 and $73,637.66, respectively. On June 8, 1961, Goodman, as treasurer of Sinter Fuel, addressed a letter to Pittsburgh National Bank stating that Sinter Fuel had paid out $85,521.82 to petitioner and Goodman in violation of the subordination agreements of December 26, 1956, and asked the bank to ratify this action. The balance due each on December 31, 1960, was $19,368.70 and *107 $67,643.64, respectively. On July 12, 1961, Goodman requested that the subordination agreements be cancelled by the bank since Sinter Fuel was no longer indebted to it and the bank acquiesced. The individual Federal income tax returns for petitioner and Goodman for years prior to 1958 did not report any royalty income from Sinter Fuel. The first individual Federal income tax return of either petitioner or Goodman reporting the receipt of royalty income from Sinter Fuel were their returns for the calendar year 1958 filed by petitioner on July 16, 1959, and Goodman on June 15, 1959, both subsequent to the assignment executed on June 17, 1958. (Sinter Fuel did show the payment of some royalties on its fiscal 1953 and 1954 corporation returns but it is impossible to tell to whom or for what they were paid.) The assignment of June 17, 1958, was not entered on the books and records of the corporation. The only entries on the books and records of Sinter Fuel reflecting the assignment was the opening of an account payable termed "Materials Payable." This account reflected Sinter Fuel's liability for the payments provided for in the assignment of June 17, 1958. There was no asset account *108 on the books of the corporation which revealed the assignment of June 1958. In all financial statements and tax returns the payments under the assignment were treated as "Materials Payable" and appear in Sinter Fuel's cost of sales as a current expense designated "purchases." There was no written agreement of partnership or joint venture between petitioner and Goodman. There also was no written agreement between petitioner, Goodman and Sinter Fuel with respect to the coke ash piles prior to June 17, 1958. Petitioner received $2,594.05 from Sinter Fuel during the year 1960 which he did not report as taxable income for that year. Sinter Fuel's general ledger recorded the payments as a distribution of amounts due petitioner for "Materials Payable," the same account under which were recorded all the other amounts in issue in these cases. In the year 1964 entries were made on the general ledger by petitioner's accountant reducing loans by $2,594.05 and increasing "Materials Payable" by the same amount. This resulted in treating the 1960 payment as a return of loan rather than a payment of "Materials Payable." Opinion Petitioner contends that he and Goodman each owned 50 percent *109 of the leases listed in the assignment of June 17, 1958; that the leases were capital assets held for more than 6 months; that they were sold to Sinter Fuel; and that, consequently, he is entitled to report the amounts he received with respect to the sale as long-term capital gains. Respondent asserts that petitioner acquired the leases for the benefit and ownership of Sinter Fuel in his capacity as an officer, director, and stockholder in the corporation; that petitioner was not a part owner of the leases listed in the assignment; and that petitioner and Goodman could not have sold such leases in June 1958. Thus it is respondent's primary contention that the sale was a nullity and merely a disguised distribution of earnings to petitioner and Goodman. The issue here presented is basically factual, and must necessarily turn upon our evaluation of the conflicting and confusing evidence contained in the record before us. Petitioner's position is predicated on his and Goodman's testimony that they purchased the leases for themselves and the presentation of the assignment and the leases involved, all but one of which name petitioner and Goodman, or petitioner, as lessees or assignees. *110 Respondent's position, on the other hand, is supported substantially by circumstantial evidence which we think is convincing. Petitioner's evidence is not of a character we deem inherently credible. . Without repeating all the facts set out in detail in our findings, we will merely pinpoint those we find most persuasive in reaching this conclusion. Petitioner first maintains that the fact that he and Goodman were receiving royalties from Sinter Fuel is strong proof that they owned the leases in question. However, none of their returns reported the receipt of any royalties from Sinter Fuel prior to 1958, and even their returns for that year reported royalties with respect to Dearth only. There is no doubt that the testimony of petitioner is in sharp conflict with the documentary evidence. Both petitioner and Goodman testified that they paid many of the corporate bills out of their own pockets and were reimbursed by Sinter Fuel when it had money available. With a capitalization of only $1,500 and only one year in the black from 1950 through 1958, it is no wonder that such a method of operation was necessary. Their *111 decision to operate Sinter Fuel out of their own pockets is illustrated by the fact that it was necessary for them to subordinate advances in the amounts of $98,896.50 and $73,637.66 to permit the corporation to obtain outside financing in 1956. There was also testimony by Goodman concerning other advances and guarantees of loans made by him. Respondent argues, and we agree, that petitioner has failed to prove that the sums paid by him and Goodman for the acquisition of the coke ash pile leases were any different from the sums they advanced directly to and for the corporation to take care of other business costs, including the activities of Manoli. It is of course true that a corporation and its stockholders are separate entities and that the owners of a corporation are allowed wide latitude in controlling and running the corporation. See , and . However, after a painstaking review of this record, packed as it is with inconsistencies and unanswered questions, for the most part, we have been unable to determine precisely who did what, *112 for whom and when. But we are nonetheless satisfied that petitioner and Goodman were acting for Sinter Fuel when they purchased the leases in question as well as when they made advances and loans to the corporation. Most of the advances by, and reimbursements to, petitioner and Goodman were undesignated except in a general manner. We do not know exactly what they were for other than what was expressed in the vague testimony of petitioner and Goodman. Respondent suggests the possibility, which petitioner denies vehemently, that some of the undesignated reimbursements to petitioner and Goodman were to cover the purchase price of the leases. Suffice it to say that the manner in which Sinter Fuel's books and record were maintained has not helped convince us that petitioner and Goodman were dealing with their wholly-owned corporation in anything resembling an arm's-length manner. The charts we prepared, which are set forth in our Findings of Fact, are indicative of the inconsistent and incomplete manner in which both Sinter Fuel and petitioner kept their records. It is exceedingly difficult to reconcile many of the figures in our chart analyzing Sinter Fuel's corporate debt; balances *113 in various categories appear and disappear, or are transposed, without explanation. The chart analyzing petitioner's income from 1954 through 1958 was prompted by petitioner's testimony that he frequently advanced large sums to and for Sinter Fuel. This information, coupled with petitioner's testimony that he was in several usuccessful businesses which lost large sums of money prior to the incorporation of Sinter Fuel and the statement contained in the offer in compromise he executed on January 29, 1957 (under the penalties of perjury) stating that he was hopelessly in debt, makes it difficult for us to believe that petitioner had available the large sums of money he claims he advanced to and for Sinter Fuel. Our analysis of the wages paid officers by Sinter Fuel and the profits available to it from 1950 through 1962 serves to reinforce this doubt as well as emphasize the inconsistencies we have had to deal with. In addition to the other facts militating against petitioner's avowed ownership of the leases, his failure to include the leases as his assets in the statement attached to his offer in compromise is certainly strong evidence that he did not own the leases at that time. *114 Petitioner and Goodman both testified that the assignment of the leases was prompted by their poor health. We note, however, that Goodman's hospitalization and petitioner's first heart attack occurred in 1955, nearly three years prior to the assignment. In fact, these events occurred prior to the Sugarman agreement of 1955 and the Globe Dismantling arrangement of December 1956. If health problems were really a compelling factor, it would seem that the assignment would have been entered into hard on the heels of their physical ailments. In our judgment petitioner and Goodman never actually doubted that Sinter Fuel owned the leases and ultimately entered into the June 1958 assignment merely to preclude any question as to title in the leases. Petitioner asks how this Court could possibly believe that an attorney of Goodman's "eminence" would sell something he did not own. Yet it does indeed seem strange that Goodman would sell, as his own, a lease on whose face Manoli and Sinter Fuel are shown as lessees (Oliver 1) or take a depreciation deduction for a lease (Dearth) which he purportedly sold in the prior year. Being unwilling to accept the testimony of petitioner and Goodman as *115 inherently credible, we have only the leases themselves to consider. Of the 14 properties listed in the June 17, 1958, assignment we have found that the six (Grindstone, Smock, Lambert, Mammoth, Marguerite, and United) acquired through the Sugarman agreement were purchased for Sinter Fuel; that another lease (Oliver 1) which showed Manoli and Sinter Fuel as lessees was purchased by and for Sinter Fuel; that a third lease (Dearth) was acquired one day prior to the June 1958 assignment; that no coke ash was ever removed from a fourth lease (Continental # 1); and that no evidence was introduced as to a fifth lease (Thomson # 3 Republic). Our analysis of the facts convinces us that all the leases were purchased for Sinter Fuel and were not owned by either petitioner or Goodman. Consequently, we conclude that the assignment of June 17, 1958, was a nullity and therefore all the income received with respect to such leases from July 1, 1958, to date should be taxed as ordinary income. In view of our conclusion on this principal issue as to the ownership of the leases, we need not consider respondent's alternative contentions. We still have remaining the question of whether the sum of $2,594.05 *116 which petitioner received from Sinter Fuel during the year 1960, but did not report as taxable income, represented return of a loan or payment with respect to the assignment of June 1958. Since respondent first raised this issue in his second amended answer he has the burden of proof. The sum was originally entered on Sinter Fuel's books as "Materials Payable," the account used to reflect payments to petitioner and Goodman with respect to the June 1958 assignment. Subsequently, when Snodgrass was preparing petitioner's 1960 return, he was told by petitioner that this was a mistake and that the sum represented repayment of a loan. Snodgrass reflected this information in petitioner's 1960 return but did not correct the general ledger until 1964, several years after the notices of deficiency were mailed in these cases. Respondent has offered no convincing evidence on this point but appears to rely on suspicions. The burden of proof cannot be carried in this manner. Therefore, on this issue we hold for petitioner. Decisions will be entered under Rule 50. Footnotes
1. The term "leases" as applied to the documents listed in the agreement above is somewhat of a misnomer. On their faces several of the "leases" are outright sales of coke ash piles as personal property; others are really hybrid documents entailing sales of the piles with limited access to the real property on which they are located. However, for the sake of simplicity, we will hereinafter refer to all the documents as leases.↩
2. Schedule G of petitioner's 1958 return shows receipt of $12,119.77 in royalties from Dearth, depreciation of $1,962.56 and net royalty income of $10,157.21. Schedule I of the same return lists Dearth as the depreciable property, leaves blank the space left for the date the property was acquired, assigns a cost basis to the property of $5,887.68, shows depreciation allowed or allowable in prior years of $1,962.56, assigns a straight line method of depreciation, a life of three years and depreciation for 1958 of $1,962.56. Schedule G of Goodman's 1958 return shows royalties from Dearth of $10,114.13, depreciation of $2,693.82 and $7,420.31 net royalties from Dearth. Schedule F of the same return lists Dearth as the depreciable property, leaves blank the space left for the date the property was acquired, assigns a cost basis to the property of $5,887.68, shows depreciation allowed or allowable in prior years of $500.04, leaves blank the method for computing depreciation, shows a rate of depreciation of 50 percent and depreciation for 1958 of $2,693.82. Schedule G of Goodman's 1959 return shows $10,495.16 as royalties from Dearth, a depreciation deduction of $2,693.82 and net royalties from Dearth of $7,801.34. Schedule I of the same return shows Dearth as the depreciable property, leaves blank the space left for the date the property was acquired and shows basically the same information that Goodman's 1958 return shows. (Petitioner's 1959 return does show net royalties of $3,696.84 but their source is not clear.) Schedule G of Goodman's amended return for 1959 shows gross royalties from Dearth of $5,048.54 instead of the $10,495.16 shown in his original 1959 return. Schedule I of the amended return is identical to Schedule I of the original return.↩
*. A short paragraph which appeared in the original opinion at this point was deleted by official order of the Tax Court dated October 6, 1965 and signed by Judge Dawson.↩
1. These figures are reproduced from the income tax returns petitioner filed for his 1954 through 1958 calendar years. ↩
2. This is almost all income from a beauty parlor petitioner owned. ↩
3. Apparently petitioner gave the beauty parlor to his daughter in 1956 and retained income from the operation of $5,200 a year. ↩
4. This was profit from an undesignated sale of "merchandise."↩
1. These figures are reproduced from the corporation income tax returns filed by Sinter Fuel for its fiscal years 1950 through 1962. ↩
2. Sinter Fuel was on a June 30 fiscal year. ↩
3. Sinter Fuel's return for this year shows that only $1,500 of this amount was paid to petitioner. ↩
4. It is not clear whether this sum represents office salaries or officers' salaries - if the former, then there is no information as to officers' salaries for 1955.↩
1. These figures are reproduced from the corporation income tax returns filed by Sinter Fuel for its fiscal years 1950 through 1962. The designations are those used on the returns. ↩
2. Both the loan and note categories omit a small mortgage debt and another small loan for which collateral was put up. ↩
3. Opening and closing balances for year. ↩
5. This was the first year that Snodgrass prepared Sinter Fuel's returns. ↩
6. This category was designated "loans and advances." ↩
7. See footnote 6.↩
4. This category was designated "salaries - royalties." ↩